IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LATECIA S. HILL | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| KILOLO KIJAKAZI, | : | |
| Commissioner of Social Security | : | NO. 21-2775 |

**O P I N I O N**

SCOTT W. REID                                                                                 DATE:  March 8, 2022
UNITED STATES MAGISTRATE JUDGE

Latecia S. Hill brought this action under 42 U.S.C. §405(g) to obtain review of the decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). She has filed a Request for Review to which the Commissioner has responded. As explained below, I conclude that the Request for Review should be denied and judgment entered in favor of the Commissioner.

I.    ***Factual and Procedural Background***

Hill was born on February 16, 1987. *Record* at 216. She completed high school and one year of college. *Record* at 247. She worked in the past as a security guard, customer service representative, and as a stock clerk. *Id*.

On or about June 12, 2019, Hill filed applications for DIB and SSI, asserting disability since April 11, 2018, the date of a motor vehicle accident in which a commuter bus in which she was a passenger was struck from the rear. *Record* at 216, 519. She asserted that she was disabled by a brain injury, post-concussion symptoms, dizziness, giddiness, cognitive communication deficit, nausea, cervicalgia, tinnitus, emotional lability, sleep problems, visual

problems, and shoulder and back injuries. *Record* at 246. Hill was pursuing litigation in connection with the traffic accident at the time she applied for benefits. *Record* at 47.

Hill's applications for DIB and SSI were denied on September 19, 2019. *Record* at 131, 136. On November 8, 2019, they were denied again upon reconsideration. *Record* at 129, 130. Hill then requested a hearing *de novo* before an Administrative Law Judge ("ALJ"). *Record* at 147.

A hearing before an ALJ was held on April 2, 2020. *Record* at 33. On April 27, 2020, however, the ALJ issued a written decision denying benefits. *Record* at 12. The Appeals Council denied Hill's request for review on May 14, 2021, permitting the ALJ's decision to serve as the final decision of the Commissioner of Social Security. *Record* at 1. Hill then filed this action.

## II.     *Legal Standards*

The role of this court on judicial review is to determine whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. §405(g); *Richardson v. Perales*, 402 U.S. 389 (1971); *Newhouse v. Heckler*, 753 F.2d 283, 285 (3d Cir. 1985). Substantial evidence is relevant evidence which a reasonable mind might deem adequate to support a decision. *Richardson v. Perales*, *supra*, at 401. A reviewing court must also ensure that the ALJ applied the proper legal standards. *Coria v. Heckler*, 750 F.2d 245 (3d Cir. 1984); *Palmisano v. Saul*, Civ. A. No. 20-1628605, 2021 WL 162805 at *3 (E.D. Pa. Apr. 27, 2021).

To prove disability, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." 42 U.S.C. §423(d)(1). As explained in the

following agency regulation, each case is evaluated by the Commissioner according to a five-step process:

> (i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled.  (ii)  At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in §404.1590, or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.  (iii)  At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

20 C.F.R. §404.1520(4) (references to other regulations omitted).

Before going from the third to the fourth step, the Commissioner will assess a claimant's residual functional capacity ("RFC") based on all the relevant medical and other evidence in the case record.  *Id*.  The RFC assessment reflects the most an individual can still do, despite any limitations.  SSR 96-8p.

The final two steps of the sequential evaluation then follow:

> (iv)  At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled.  (v)  At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make the adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.

*Id*.

### III.    The ALJ's Decision and the Claimant's Request for Review

The ALJ determined that Hill suffered from the severe impairments of post-concussion syndrome, cervical and lumbar degenerative disc disease, and obesity. *Record* at 14.  She acknowledged that Hill had been diagnosed with psychiatric impairments, but found that the limitations resulting from those impairments were adequately accommodated by limitations

imposed in the Residual Functional Capacity ("RFC") to address "resolving post-concussion syndrome." *Record* at 15-16.  The ALJ did not find Hill to suffer from a severe shoulder or knee impairment.  *Record* at 16.  She went on to determine that no impairment or combination of impairments met or medically equaled a listed impairment.  *Record* at 16-17.

The ALJ found that Hill retained the RFC to perform light work, but that she was limited to work requiring simple, routine tasks; work that was as "self-paced as possible, meaning that any production criteria can be made up by the end of the workday or shift;" few workplace changes, "meaning that the same duties can be performed at the same station or location from day to day,"; no contact with the general public; occasional interaction with coworkers and supervisors; no exposure to unprotected heights or unprotected moving mechanical parts; occasional exposure to loud noise; occasional stooping, crouching, crawling, kneeling, and climbing ramps and stairs; and no climbing ladders, ropes, or scaffolds.  *Record* at 19.

Relying upon the testimony of a vocational expert ("VE") who appeared at the hearing, the ALJ determined that Hill could not return to her prior work, but that she could still work as a packer, inspector/sorter, or assembler.  *Record* at 26-27.  She decided, therefore, that Hill was not disabled.  *Record* at 28.

In Hill's Request for Review, she argues that the ALJ failed to accord proper weight to the limitations specified by her treating doctor, Mary Brownsberger, Psy.D.  She also argues that the ALJ mischaracterized the medical evidence as to her physical impairments.  Further, Hill maintains that the ALJ failed to consider the combined effect of her impairments and the resulting exertional and non-exertional limitations.  Finally, she argues that the ALJ proposed hypothetical questions to the VE which failed to take all of her limitations into account.

IV.     **Discussion**

    A.     ***Dr. Brownsberger's Opinions***

Mary Brownsberger, Psy. D., director of psychology for the Good Shepherd Rehabilitation Network, submitted to the record a Post Traumatic Brain Injury RFC Questionnaire and a Mental Impairment Questionnaire, both dated March 16, 2020. In the Post Traumatic Brain Injury Questionnaire, she reported that she provided Hill with weekly "psychological treatment." *Record* at 1223.

Dr. Brownsberger listed Hill's diagnoses as post-concussion syndrome, PTSD, and a severe major depressive disorder. *Id*. She described her as suffering from intermittent severe headaches, dizziness, vertigo, nausea, sensitivity to light, visual disturbances, mood changes, and mental confusion/inability to concentrate, as well as exhaustion, irritability, and muscle strain. *Record* at 1224. Dizziness occurred multiple times daily, upon arising from bed or from a seated position, and lasted 1-5 minutes per episode. *Record* at 1224, 1226. Headaches, also occurring multiple times daily, lasted from 30-60 minutes, and were only resolved by lying down in a dark room. *Record* at 1224-1225. Nevertheless, Hill's headaches were treated with only over-the-counter medications, such as Excedrin. *Record* at 1227. Dr. Brownsberger asserted that an MRI substantiated the existence of Hill's headaches. *Record* at 1225.

According to Dr. Brownsberger, Hill would not be able to work while experiencing a headache. *Record* at 1227. She would need hourly unscheduled breaks, each lasting over an hour. *Record* at 1227-1228. Hill would also be absent more than four times a month as a result of her impairments or treatment. *Record* at 1228.

In the Mental Impairment Questionnaire*,* Dr. Brownsberger listed the following "signs and symptoms" of mental illness: decreased energy, thoughts of suicide, a blunt affect, feelings

5

of guilt or worthlessness, impairment in impulse control, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, recurrent and intrusive recollections of past trauma, psychomotor agitation or retardation, motor tension, emotional lability, vigilance, memory impairment, sleep disturbance, recurrent severe panic attacks, and "psychological or behavioral abnormalities association with a dysfunction of the brain with a specific organic factor." *Record* at 1231.

According to Dr. Brownsberger, Hill had marked restrictions in her activities of daily living and in concentration, persistence or pace; and moderate difficulties in social functioning. *Record* at 1232. She had one or two "repeated episodes of decompensation within a 12-month period, each of at least two weeks' duration." *Id*.

The ALJ found neither of Dr. Brownsberger's reports to be persuasive. *Record* at 25, 26. As to both reports, she noted that: (a) no records in the file confirmed that Dr. Brownsberger ever treated or even examined Hill, and that "more importantly" (b) the record did not support the extensive limitations set forth in her reports. *Record* at 26.

As the ALJ accurately reported, there are no notes in the record from Dr. Brownsberger. Hill's brief states that Dr. Brownsberger is the director of "the facility where Plaintiff treated twice per week for occupational and physical therapy from June 2018 through July 2019," adding that "according to Plaintiff, she was evaluated consistently by Dr. Brownberger [*sic*] throughout the course of her treatment at Good Sheppard [*sic*] and currently remains under Dr. Brownberger [*sic*]'s care." *Brief in Support of Request for Review* at unpaginated CMEC page 12. Medical records from Good Shepherd Rehabilitation Network reflect physical and occupational therapy for neck and back dysfunction between April 23, 2018 and April 29, 2019. *Record* at 712-1125.

6

Dr. Brownsberger, however, identified herself as the director of *psychology* at Good Shepherd, and it seems unlikely that in this capacity she would supervise the work of a physical or occupational therapist. If, however, this was Dr. Brownsberger's role, it would not provide her with a basis for the opinions set forth in her reports, particularly those in the Mental Impairment Questionnaire.

Nevertheless, Hill stated at her hearing that she continued to treat weekly with a "neuropsychologist." Record at 47. Further, Dr. Brownsberger indicated that she provided Hill with weekly psychological therapy. *Record* at 1223. It is likely that Dr. Brownsberger acted as Hill's therapist, but that Hill did not submit her records as part of her application.

If this is the case, the ALJ would be justified in finding that the absence of treatment records undermined the reliability of Dr. Brownsberger's questionnaires. The opinions she expressed there could not be compared for consistency with her own contemporary notes or testing. *See*, *e.g.*, *Church v. Commissioner of Social Security*, Civ. A. 19-12409, 2020 WL 1847674 at *7 (D.N.J. Apr. 13, 2020) (affirming an ALJ who found that "Plaintiffs' treating physicians' 'checkbox' opinions were generally not consistent with their treatment notes"), *and Dee v. Berryhill*, Civ. A. No. 17-73, 2018 WL 783733 at *2 (W.D. Pa. Feb. 8, 2018) (also affirming an ALJ who rejected a "checkbox questionnaire" which was unsupported by contemporaneous treatment notes).

Further, as the ALJ noted, even more significant than the lack of treatment notes from Dr. Brownsberger is the fact that her opinions are inconsistent with the other evidence of record. The earliest mental health treatment reflected in the file is a psychiatric evaluation performed on July 27, 2018, by Teresa Duda, LCSW. *Record* at 431. Hill reported a history of short-term mental health counseling for "relationship issues," but no inpatient treatment. *Record* at 431-2.

Hill reported "neuropsychiatric sequalae" of a traumatic brain injury sustained in the bus accident. *Record* at 431. According to Ms. Duda, however, a May 3, 2018, MRI of Hill's head showed "no evidence of acute intracranial hemorrhage." *Id*.

At that time, Hill was fully oriented and appropriate in her appearance and alertness, with pleasant behavior. *Record* at 433. She had normal speech and language, logical and goal-directed quality of thought, and relevant/coherent thought content, as well as good concentration, intact memory and "sufficient" attention. *Id*. She told Ms. Duda that she had been having general suicidal thoughts. *Record* at 433-4. However, she had no history of suicide attempts. *Record* at 434. Ms. Duda diagnosed Hill with an adjustment disorder with mixed anxiety and depressed mood. *Id*.

On June 10, 2019, Hill was seen by Angela Groller at a facility called Concern. *Record* at 392. Ms. Groller's note states: "Had a concussion shortly over a year ago which she believes is the start of the change in her mental health." *Record* at 393. Upon examination, Hill was disheveled, but was fully oriented and displayed goal directed thought processes with good judgment and insight, attentive concentration, and no sign of hallucinations, delusions, obsessions or compulsions. *Record* at 399. However, she reported suicidal thoughts daily, and a lack of desire to be involved with her family. *Record* at 400.

On June 17, 2019, Hill was again seen at Concern, this time by Amber Karom, LSW, MSW. *Record* at 401. Ms. Karom reported: "Latecia suffered a brain injury a year ago and is having a hard time concentrating, controlling her temper and regulating her moods." *Record* at 402. The Record contains no further notes from Concern.

The most recent records of mental health treatment are two therapy notes from Valley Geropsych LLC, dated January 8 and February 7, 2020, and authored by Dr. Raja Abbas.

Record at 1150-1157. Dr. Abbas described Hill on both occasions as anxious and depressed, and with paranoid thought content. *Record* at 1151-2. She was, however, fully oriented and well-groomed with no unusual behaviors, good eye contact, normal speech, goal directed and logical thought processes with an intact memory, fair insight, judgment, and impulse control. *Id.*, and 1155-6. These reports do not support the existence of the extreme mental health symptoms reported by Dr. Brownsberger in the Mental Health RFC Questionnaire.

The ALJ also had before him the reports from reviewing agency mental health specialists, Karen Plowman, DO, and Francis Murphy, Ph.D. *Record* at 67-8 (Plowman) and 102-103 (Murphy). Both Dr. Plowman and Dr. Murphy found Hill to have moderate limitations in the ability to understand, remember or apply information, and in maintaining concentration, persistence or pace; and mild limitations in the ability to interact with others, and the ability to adapt or manage oneself. *Record* at 68, 103. The ALJ found these reports persuasive, as they were more consistent with the other evidence of record than were Dr. Brownsberger's. *Record* at 24-5. She made the same findings as to the severity of Hill's mental impairments. *Record* at 17-18.

Nor were the physical aspects of Dr. Brownsberger's assessments strongly supported by the evidence of record. She wrote that a head MRI substantiated the existence of Hill's headaches, but the only head MRI in the Record, dated May 4, 2018, was normal. *Record* at 473. An MRI of the cervical spine of the same day showed no compression fracture or subluxation (dislocation). *Record* at 481.

Also notable was that, despite her indication that Hill was essentially disabled by her headaches, Dr. Brownsberger wrote that Hill treated the headaches with only over-the-counter medications. *Record* at 1227. This is confirmed by the note from a May 13, 2019, visit with

9

Tamara Callender, CRNP, of Lehigh Valley Health Network, who wrote: "Ms. Hill reports that she has headaches rated severe. They are daily … She takes Excedrin or Tylenol ES." *Record* at 416. Further, Hill did not mention multiple daily headaches to Dr. Abbas or at Concern.

As the ALJ noted, Hill was found to have abnormalities in eye testing, and was treated at the Good Shepherd Vision Center between February and May, 2019. *Record* at 22, 371-390. The note from her final visit, however, included this notation: "Reviewed that her visual symptoms have improved but she does not feel any better, which is suggestive that … the underlying etiology of her symptoms may not related [*sic*] to her incidental vision findings." *Record* at 389.

Aside from discussing the "rather benign" diagnostic and clinical examination findings, the ALJ also found "compelling" the fact that Hill did not seek medical treatment until April 13, 2018, two days after the bus accident, at which time she reported to the emergency room at St. Luke's Hospital that she had a "mild headache" but explicitly "denied head injury." *Record* at 26, 519.

Hill returned to the St. Luke's emergency room on April 18, 2018, telling staff that the medications she obtained on her last visit were not relieving her pain. *Record* at 515, 519. At that time, she reported a headache, although "no obvious injury occurred" at the time of the accident. *Record* at 518. This visit ended when Hill "ripped out her IV and walked out from treatment room and left facility" after receiving Toradol, Reglan and Valium. *Record* at 519. Emergency room staff wrote: "Patient appeared drug-seeking in the emergency department and also had malingering tendencies, complaints for apparent minor MVC." *Record* at 517-518.

Considered as a whole, therefore, the substantial evidence of record supported the ALJ in deciding that Dr. Brownsberger's findings were not persuasive. Further, the ALJ discussed this evidence in detail. Her treatment of Dr. Brownsberger's reports does not, therefore, provide any basis for disturbing her decision.

### B.     *Hill's Physical Impairments: Her Cervical and Lumbar Spine*

Regarding Hill's allegations of physical impairment, the ALJ wrote:

> The claimant's endorsed symptoms, and subsequent diagnoses and treatment, are out of proportion with the objective evidence. With regard to her physical complaints, the claimant had normal x-ray imaging of the cervical and lumbar spines, left shoulder, left knee and chest, and a normal MRI of the brain. Later, cervical and lumbar MRIs showed some degenerative changes, but no central canal or foraminal stenosis at any level. Dr. Mortazavi [of Valley Pain Specialists]'s review of the reports, however, led him to diagnose contradictorily spinal stenosis in the lumbar region with neurogenic claudication and spinal stenosis of the cervical region, for which he provided epidural steroid injections.

*Record* at 23.

Hill challenges this conclusion as relying on x-ray evidence rather than MRI evidence. *Plaintiff's Brief* at CMEC page 17. However, the ALJ clearly cited "cervical and lumber MRIs." Further, the 2018 MRIs cited by Hill are consistent with the ALJ's analysis of the evidence. A December 1, 2018, MRI of the cervical spine showed "no significant disc protrusion, spinal or foraminal stenosis" at most levels, and a small protrusion "but without significant spinal or foraminal stenosis" at C6-7. *Record* at 1127. A December 28, 2018, MRI of the lumbar spine was even more benign, showing "no significant disc protrusion, spinal or foraminal stenosis." *Record* at 1226. These MRI reports were forwarded from Valley Pain Specialists. Yet, as the ALJ observed, it is impossible to see how MRIs finding "no stenosis" support Dr. Mortazevi's diagnosis of lumbar and cervical spinal stenosis. *Record* at 1131.

As the ALJ also noted, Hill was discharged from physical and occupational therapy for failing to attend sessions by two different providers, Lehigh Valley Hospital and Good Shepherd. *Record* at 428, 810. This failure to participate in therapies may be considered inconsistent with Hill's complaints of physical pain and limitation.

    C.    *The Combination of Hill's Impairments*

Hill argues that the ALJ did not comply with law compelling her to consider the combined effect of Hill's impairments. The law she cites, however, directs an ALJ to consider even non-severe impairments when assessing disability. 42 U.S.C. § 423(d)(2)(c). The ALJ in this case found Hill's post-concussion syndrome – which included her psychiatric symptoms and apparently her headaches, all of which she argues are a result of the traffic accident – and her cervical and lumber degenerative disc disease to be severe impairments, along with her obesity. *Record* at 14. The law Hill cites is, therefore, irrelevant to her argument that the ALJ failed to consider her "lumbar and cervical pain, cognitive deficiencies, balance and vestibular issues, migraine headaches [and] significant mental health issues." Request for Review at unpaginated page 13.

In any event, the RFC assessment reached by the ALJ included limitations designed to ameliorate Hill's cognitive difficulties and difficulties in interacting with people, and also included postural limitations to address her back pain. *Record* at 19. The ALJ addressed Hill's alleged balance/vestibular issues by providing that she could not be exposed to heights or moving mechanical parts, or climb ladders, ropes or scaffolds. *Id*.

It is apparent that the ALJ did not credit Hill's allegation that her headaches required her to take multiple hour-long rest sessions per day. Substantial evidence supports the ALJ in this. For one thing, the sole medical provider who endorsed the multiple daily headaches is Dr.

12

Brownsberger, who appears to have been Hill's therapist. Dr. Brownsberger had a doctorate in psychology, but she was not a medical doctor (i.e., an MD or a DO), and was not qualified to diagnose the nature of Hill's headaches. Nor could the ALJ determine whether Hill complained to Dr. Brownsberger of severe headaches during their treating relationship, because her notes were not in the record.

Secondly, even though Hill's headaches were alleged to be essentially crippling, Hill treated them with only over-the-counter medications. *Record* at 416, 1127. As of the date of Hill's hearing before the ALJ, no care provider had prescribed anything stronger. What is more, no care provider referred Hill to a neurologist or other doctor qualified to diagnose and treat headache. If they did, Hill has not included the specialist's treatment notes.

Thus, the ALJ's RFC assessment adequately addressed the combination of Hill's impairments. Hill has not shown a basis for relief in this regard.

### D.     *The ALJ's Hypothetical Questions to the VE*

Finally, Hill argues that the hypothetical questions posed by the ALJ to the VE at the hearing failed to accurately reflect all her limitations, and that, therefore, the VE evidence was not reliable. *Plaintiff's Brief* at CMEC page 16. She specifically mentions limitations involving her cervical and lumbar spine, and her need to "lay down and rest for hours at a time" because of her headaches. *Id.* Unsurprisingly, the VE testified that "the need to lie down hourly, for over an hour each time" would preclude Hill from engaging in full-time work. *Record* at 59.[1]

Although a hypothetical question posed to a vocational expert must reflect all of a claimant's impairments, this does not mean that it must include every impairment alleged by the

---

[1] Despite Hill's representations, however, the VE did not testify that limitations regarding her spine would render her unable to work. On the contrary, she testified that there was work Hill could perform even if limited to the sedentary exertional level. *Record* at 58-59.

13

claimant. *Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). Instead, it need only contain credibly established limitations. *Zirnsak v. Colvin*, 777 F.3d 607, 614-615 (3d Cir. 2017); *Rutherford*, *supra*. Where a limitation is supported by some medical evidence, but is opposed by other evidence, the ALJ has the discretion to choose whether or not to include it in the hypothetical. *Zirnsak* at 615.

As discussed above, Hill has not proved the existence of credibly established limitations which were not recognized by the ALJ, and she certainly has not shown the existence of limitations which are not opposed by some of the medical evidence. She has not, therefore, shown an error in the hypothetical questions posed by the ALJ to the vocational expert.

## V.    Conclusion

In accordance with the above discussion, I will enter an Order of even date directing that Hill's Request for Review be denied, and judgment entered in favor of the Commissioner.

BY THE COURT:

*/s/ Scott W. Reid*

SCOTT W. REID
UNITED STATES MAGISTRATE JUDGE